UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ZOTBELLE, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-11411-ADB |
| | * | |
| KRYOLAN CORPORATION and | * | |
| KRYOLAN GmbH, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

In this commercial dispute following the underperformance of a make-up retail store,

Plaintiff Zotbelle, Inc. ("Zotbelle"), whose President ran the store, alleges that Defendants

Kryolan Corporation and Kryolan GmbH (together, "Kryolan") breached a contract or implied

contract that set the terms for the parties' relationship, breached the implied covenant of good

faith and fair dealing, misrepresented information about its intended relationship with Zotbelle,

and engaged in unfair and deceptive business practices in violation of Massachusetts General

Laws ch. 93A, § 11 ("Chapter 93A"). Currently pending before the Court are Zotbelle's and

Kryolan's cross-motions for summary judgment. [ECF Nos. 49, 50]. For the following reasons,

Kryolan's motion for summary judgment on all counts of the Amended Complaint and on its

cross-claim [ECF No. 50] is GRANTED, and Zotbelle's motion for partial summary judgment

on its Chapter 93A claim [ECF No. 49] is DENIED.

## I.   BACKGROUND

### A.   Factual Background

The following facts are uncontroverted pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 unless otherwise stated.  Kryolan is a professional makeup brand that has supplied the film, theater, and television industries for over 70 years.  [ECF No. 53 ("Kryolan's Statement of Facts" or "KSOF") ¶ 3].  Kryolan Corporation is incorporated in California and operates Kryolan's business in the United States.  [KSOF ¶ 4].  Claudia Longo is the Secretary and CEO of Kryolan Corporation.  [KSOF ¶ 5]; see [ECF No. 49-2 ("Zotbelle's Statement of Facts" or "ZSOF") ¶ 6].  Kryolan Corporation is a wholly-owned subsidiary of Kryolan GmbH, which is incorporated in Germany and managed by Wolfram Langer and two other individuals. [KSOF ¶¶ 3–4; ZSOF ¶ 3].

Zotbelle is incorporated in Barbados and registered to do business in Massachusetts. [KSOF ¶ 1; ZSOF ¶ 1].  Deborah Blenman is the President of Zotbelle.  [KSOF ¶ 2; ZSOF ¶ 2]. Zotbelle's business relationship with Kryolan dates back to at least 2011.  [KSOF ¶ 6; ZSOF ¶ 8].  Ms. Blenman worked as a make-up retailer and sales representative for Kryolan in Barbados and the Caribbean.  [KSOF ¶ 6].  She held a B-1 visa in June 2013 that allowed her to temporarily visit the United States but did not permit her to remain in the United States to manage a business or to work for a business.  See [KSOF ¶ 40].  Ms. Blenman never obtained a work permit that would have allowed her to be employed in the United States.  [KSOF ¶ 41].

In May 2013, Ms. Blenman expressed interest in opening a Kryolan store in Boston and wrote to Mr. Langer about the business opportunity.  [KSOF ¶¶ 7, 11].  On May 14, 2013, Ms. Blenman e-mailed Mr. Langer to confirm the details of a telephone conversation with him. [KSOF ¶ 13].  The email read as follows:

ZOTBELLE is responsible for finding a location of approx.. 700- 800 sq. ft. in good location in Boston for the retailing of KRYOLAN PROFESSIONAL MAKE-UP and Dr. Babor Skin Care Line. (the acquiring of skin care will be arranged through Mr. Langer's office at Kryolan) Photos are to be captured and sent to Mr. Langer.

ZOTBELLE is responsible for ensuring good floors, walls and electricity in the building. The space should be lease for no less than five years and as a last resort and if absolutely necessary it can be rented under KRYOLAN CORPORATION and sub leased to ZOTBELLE.

KRYOLAN would install the furniture in the space, which is approx.. $60,000-$50,000 US and ZOTBELLE is required to pay a 1/3 of this amount after three years, in installments to be determined. Installation of the furniture should take (3) weeks; please confirm.

Product is to be ordered from the San Francisco location and the first delivery can be a maximum of $30,000 - $40,000 US to be paid in 12 months. All other orders after this are to be paid in four (4) weeks.

The target date to commence is Oct. 2013 – early next year.

Additional assistance from KRYOLAN is available upon request, within reason and under agreement.

. . . .

[Ms. Blenman] will facilitate the establishing of this store in Boston, however it will not negate from the current business in the Caribbean.

[KSOF ¶ 13].

On July 12, 2013, Ms. Longo provided Ms. Blenman with a "Proposal for Kryolan City Boston 31 Saint James St."  [KSOF ¶ 20; ECF No. 51-10].  This document provided for a $20,000 deposit and a five-year lease with a lease amount of $1,500 "[p]lus 5% of net Retail Sales or 9.5 % of value of purchased products, whatever is greater, but not less than the agreed annual minimum purchases."  [KSOF ¶ 21; ECF No. 51-10].  Ms. Blenman responded the same day and inquired what the $20,000 deposit was for.  [KSOF ¶ 22].  Mr. Langer explained that Kryolan would bear all the expenses of remodeling the store and equipping it with furniture and

that he "[thought] it to be fair that [Ms. Blenman] contribute with a deposit."  [KSOF ¶ 23].

After an additional email exchange, Kryolan reduced the deposit to $17,000.  [KSOF ¶¶ 24–25].

Ms. Blenman testified that, at the time, she "understood [the deposit] . . . was the franchise fee."

[KSOF ¶ 26].

Kryolan entered into a five-year lease agreement dated August 8, 2013 for the retail store

location at 31 St. James Avenue in Boston.  [KSOF ¶ 27; ZSOF ¶ 9; ECF No. 51-13].  Kryolan

paid for the renovations and furnishing of the store ("Kryolan City Boston") and supplied the

initial inventory.  [KSOF ¶ 28].  Kryolan City Boston opened on December 7, 2013.  [KSOF

¶ 29; ZSOF ¶ 10].

Zotbelle alleges that it entered into an agreement with Kryolan before Kryolan City

Boston opened on December 7, 2013 concerning "things like marketing, the sales, . . .

advertising, technical, . . . information, workshops," and that this agreement was not reflected in

any writing.  [KSOF ¶ 62].  Ms. Blenman understood from these conversations that Kryolan

promised to provide marketing and advertising for Kryolan City Boston.  [KSOF ¶ 63].  Ms.

Longo agreed that she spoke with Ms. Blenman about marketing but recalled discussing general

marketing and awareness of the Kryolan brand rather than advertising for the Kryolan City

Boston store specifically.  See [KSOF ¶ 63].

On February 4, 2014, Kryolan Corporation and Ms. Blenman executed an "Agreement

for operating a retail store named Kryolan City Boston at 31 St. James St., Boston" ("Lease

Agreement"), which had been drafted by Ms. Longo and Mr. Langer.  [KSOF ¶ 31; ZSOF ¶¶ 11–

12; ECF No. 58 at 5; ECF No. 51-12].  The Lease Agreement required Ms. Blenman to pay a

monthly lease payment, a "base payment" of $17,000, and inventory invoices according to a

schedule set by the contract.  [KSOF ¶¶ 35–36; ZSOF ¶ 13; ECF No. 51-12].  The Lease

Agreement also stated that any sales promotions needed to be authorized by Kryolan and that store personnel were required to follow Kryolan's dress code.  [ZSOF ¶¶ 17–19; ECF No. 51-12].  Neither Zotbelle nor Kryolan GmbH are parties to the Lease Agreement.  [KSOF ¶ 33]. Zotbelle argues that it assumed the Lease Agreement and notes that a loan agreement between Zotbelle and Kryolan GmbH states that "ZOTBELLE INC. requests the loan to purchase the initial product supply to operate the Kryolan retail store."  [ECF No. 64 at 10].  There is no evidence in the summary judgment record corroborating an assignment of the Lease Agreement to Zotbelle.

Ms. Blenman managed and worked at Kryolan City Boston starting in December 2013. [KSOF ¶ 42].  She testified that she did not believe she was "working" in the United States because she was not on the payroll.  [Id.].  Zotbelle paid Ms. Blenman's rent in Boston, her car payment, and her tithes to Family Life Fellowship as business expenses.  [KSOF ¶¶ 43–44].

Zotbelle alleges that Kryolan City Boston was a franchise of Kryolan.  [KSOF ¶ 58].  Ms. Blenman does not recall who at Kryolan told her that she would be a franchisee.  [Id.].  Zotbelle identifies several references to Kryolan City Boston being a franchise location.  See [ZSOF ¶¶ 23–24, 26, 28–29].  On April 1, 2014, a human resources employee at Kryolan wrote in a letter for Ms. Blenman that was intended for U.S. Customs and Immigration Services that Ms. Blenman "is the owner of Zotbelle, Inc., doing business as (DBA) Kryolan City Boston as a franchise owner with four staff members."  [ZSOF ¶ 23; ECF No. 58 at 10].  Ms. Longo testified that Kryolan described Ms. Blenman as a "franchise owner" in the letter in order to "help her . . . get a visa."  [ZSOF ¶ 24].  On November 20, 2014, Ms. Longo, Mr. Langer, and Ms. Blenman corresponded concerning a proposed payment plan for Ms. Blenman to pay amounts due to Kryolan.  [ECF No. 49-3 at 59–62].  In that correspondence, Ms. Longo explained that "the

$10,000 is a contribution fee, like you have at franchises." [ZSOF ¶ 26]. On July 20, 2016, a Kryolan sales manager wrote a colleague and noted in reference to Kryolan City Boston that "one of our open stores that was a franchise suddenly los[t] the franchisee and we are re-opening that location." [ZSOF ¶ 27]. Ms. Blenman acquired business cards identifying her as a "Franchise Owner," but the parties dispute how those cards came to be printed. [ZSOF ¶¶ 28–29; ECF No. 58 at 14].

On June 30, 2014, Kryolan advised Ms. Blenman that she had failed to pay Kryolan Corporation for the initial purchase of inventory and proposed new terms for paying the debt. [KSOF ¶ 48]. Ms. Blenman argues that she was unable to pay the debt because "there are a few factors that are out of my control" including "a great need for advertising," which she said she was told was "handled by the marketing department in Germany." [ECF No. 64 at 18–21].

When Ms. Blenman did not make the inventory payments, Kryolan GmbH offered a loan in December 2014 to avoid a default under the Lease Agreement. [KSOF ¶ 49]. On December 18, 2014, Zotbelle and Kryolan GmbH entered into a loan for $63,010.37 ("Loan Agreement"), which provided for monthly payments. [KSOF ¶¶ 50–51; ZSOF ¶ 36]. Zotbelle failed to make the required payments due under the Loan Agreement and therefore defaulted on the Loan Agreement and the Lease Agreement. [KSOF ¶¶ 53–54]. The parties dispute the reason for Zotbelle's failure to comply with the terms of the Lease and Loan Agreements. [ECF No. 64 at 18–21].

On June 22, 2016, Kryolan terminated the Lease Agreement for failure to pay rent, failure to pay for inventory by defaulting on payments due under the Loan Agreement, and failure to fulfill a contractual obligation to purchase a minimum of $100,000 and $140,000 during 2014 and 2015, respectively. [KSOF ¶ 55; ZSOF ¶ 38]. Ms. Blenman testified that she

had not paid the rent in April, May, and June 2016, that she had failed to make payments due under the Loan Agreement, and that she did not purchase the required amount of annual inventory.  [KSOF ¶ 56].  Ms. Blenman states that she did not have the "necessary support that [she and Kryolan City Boston] needed in order to generate the sales . . . to make the payments to Kryolan."  [Id.].  Zotbelle confirmed that it owes $56,781 plus interest to Kryolan.  [KSOF ¶ 57].  Ms. Blenman claims to have invested $34,000 Barbados dollars into the Boston store.  [KSOF ¶ 60].

After terminating the Lease Agreement, Kryolan took over operation of the Kryolan City Boston store.  [KSOF ¶ 68].  The store was closed in June 2018 because it was not profitable.  [KSOF ¶ 68].  Concerning Ms. Blenman's ongoing business in Barbados, Kryolan Corporation also required Zotbelle to pay cash for Kryolan products and demanded that Zotbelle pay an additional 25% or a minimum of $500 on top of each product order.[1]  [ZSOF ¶ 39].  There is no written agreement between Zotbelle and Kryolan requiring it to sell product to Zotbelle in Barbados.  [KSOF ¶ 72].

### B. Procedural History

On July 5, 2017, Zotbelle initiated this action against Kryolan Corporation in the Superior Court of Suffolk County.  [ECF No. 4-1].  On August 1, 2017, Kryolan Corporation removed the case to this Court, and on August 31, 2017, it answered the complaint.  [ECF Nos. 4, 12].  On December 15, 2017, Zotbelle filed an Amended Complaint.  [ECF No. 29 ("Am. Compl.")].  Kryolan Corporation answered the Amended Complaint on January 5, 2018.  [ECF No. 31].  Kryolan GmbH answered the Amended Complaint on March 27, 2018 and asserted a

---

[1] The additional amount required to be paid on top of each product order was imposed by Kryolan Corporation to recoup a debt that Zotbelle Barbados owed to Kryolan Corporation from purchasing merchandise on credit.  [ECF No. 49-3 at 41–42 (deposition testimony of Ms. Longo)].

counterclaim for breach of the Loan Agreement.  [ECF No. 36].  Zotbelle answered the

counterclaim on April 5, 2018.  [ECF No. 43].  On November 12, 2018, Zotbelle moved for

partial summary judgment and Kryolan cross-moved for summary judgment on all counts and its

counterclaim.  [ECF Nos. 49, 50].  Both motions have been fully briefed.  See [ECF Nos. 49-1,

52, 59, 63, 67].

## II.   LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the

case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).

"A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could

decide the fact either way." Id.

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must point to "specific evidence in the record that would be admissible at trial." Ocasio-

Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively

produce evidence that negates an essential element of the non-moving party's claim,' or, using

'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable

to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124,

132 (1st Cir. 2000)).  Once the movant takes the position that the record fails to make out any

trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts

sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33,

40 (1st Cir. 2013).

In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.    DISCUSSION

### A.    Contract Claims

#### 1.    Count I: Breach of Contract

Zotbelle alleges that Kryolan breached the Lease Agreement "by failing to provide the assistance, training, marketing and support it agreed to provide to Zotbelle and which support is customarily provided by franchisors to franchisees."  [Am. Compl. ¶¶ 58–61].  As an initial matter, because Kryolan GmbH is indisputably not a party to the Lease Agreement, any contractual claim asserted against it pursuant to this contract must fail.

The Court next turns to whether Zotbelle, which was also not a party to the Lease Agreement, has standing to assert a claim for Kryolan Corporation's alleged breach.  The Lease Agreement was entered into by Ms. Blenman and Kryolan Corporation.  See [ECF No. 51-12]. Zotbelle asserts that it assumed the Lease Agreement, but it cites no evidence in the summary

judgment record to support this claim.  See [ZSOF ¶ 12 n.1; ECF No. 58 at 5].  Without an

assumption of the Lease Agreement, Zotbelle may only enforce the contract as a third-party

beneficiary.  "Under Massachusetts law, in order for a third party to enforce a contract, '[i]t must

appear from the language and circumstances of the contract that the parties to the contract

clear[ly] and definite[ly] intended the beneficiaries to benefit from the promised performance.'"

Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005)

(quoting Miller v. Mooney, 725 N.E.2d 545, 550 (Mass. 2000)).  Here, Zotbelle cannot meet this

burden.  Kryolan Corporation was listed as a party to the Lease Agreement and a corporate

officer, Ms. Longo, signed the contract on its behalf.  See [ECF No. 51-12].  In contrast, Ms.

Blenman signed the Lease Agreement in her personal capacity.  See [id.]; see also Mass. Eye &

Ear Infirmary, 412 F.3d at 229 (concluding that Massachusetts Eye & Ear Infirmary could not

pursue claim for breach of contract as a third party beneficiary where contract was signed by one

of its researchers in her personal capacity).  The Lease Agreement requires Ms. Blenman to

"establish a company under the State Laws of MA," but it does not reference Zotbelle even

though it had been registered to do business in Massachusetts since early 2013.  See [ECF Nos.

51-2, 51-12].  There is no indication in the Lease Agreement that the parties intended Zotbelle,

which is never referenced by name, to benefit from the performance of the contract.  See Mass.

Eye & Ear Infirmary, 412 F.3d at 229.  Accordingly, Zotbelle does not have standing to pursue a

breach of contract claim pursuant to the Lease Agreement, and summary judgment is proper for

Kryolan on this claim.

 Even if Zotbelle had standing to bring a breach of contract claim pursuant to the Lease

Agreement, the claim would fail as a matter of law because the Lease Agreement was an

integrated agreement, the disputed contract term is unambiguous, and, under the Court's

interpretation of the unambiguous contract term, Kryolan Corporation has not breached the contract.  First, the Court preliminarily concludes that the Lease Agreement is an integrated agreement.  "An integrated agreement is a writing that constitutes a final expression of one or more terms of an agreement."  Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1123 (1st Cir. 1995) (citing Restatement (Second) of Contracts, § 209 (1981)).[2]  "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."  Id. (citing Restatement (Second) of Contracts, § 209).  Although "[w]hether a writing has been adopted as an integrated agreement is a question of fact," "[o]rdinarily the issue whether there is an integrated agreement is determined by the trial judge in the first instance as a question preliminary to an interpretative ruling or to the application of the parol evidence rule."  Restatement (Second) of Contracts, § 209(c).

Here, all of the relevant evidence indicates that the Lease Agreement was an integrated agreement and the final expression of the parties' agreement on terms for the operation of Kryolan City Boston.  The evidence Zotbelle presents, which primarily consists of a May 14, 2013 email that Ms. Blenman sent to Mr. Langer stating that "additional assistance from Kryolan is available upon request, within reason and under agreement," does not alter this conclusion.  See [ECF No. 63 at 8–9, 11].  The Lease Agreement on its face provides detailed terms concerning the parties' business relationship.  Furthermore, the Lease Agreement was the result of months of negotiations that extended even past the opening of the store.  The lack of

---

[2] The parties agree that Massachusetts law governs interpretation of the Lease Agreement.  See Wilson v. HSBC Mortg. Servs., 744 F.3d 1, 7 (1st Cir. 2014) (applying Massachusetts law when parties did not dispute that "Massachusetts law applies to all substantive issues in th[e] case"); [ECF No. 52 at 19 n.10; ECF No. 63 at 10 (applying Massachusetts law)].

specificity in the alleged oral agreement that Zotbelle relies on compared with the detailed nature

of the Lease Agreement, which was executed after months of negotiations, strongly suggests that

the parties intended the Lease Agreement to be their complete expression of the contract terms.

See Fleet Bank of Maine v. Prawer, No. 92-cv-01740, 1993 WL 106823, at *5 (1st Cir. Apr. 7,

1993).  In addition, "the face of the document contains nothing that would indicate that the

parties did not intend it to be a complete and final expression of their rights and obligations."

See Coll, 50 F.3d at 1123.

Second, the Court finds that the disputed term of the Lease Agreement, § 9, is not

ambiguous, and thus, the parol evidence rule does not apply.  Under Massachusetts law,

interpretation of a contract, including the determination of ambiguity, is a question of law.  See

id. at 1122; Balles v. Babcock Power Inc., 70 N.E.3d 905, 911 (Mass. 2017).  "'Should the court

find the contract language unambiguous, we interpret it according to its plain terms.'  If those

plain terms unambiguously favor either side, summary judgment is appropriate."  Bank v. Int'l

Bus. Machines Corp., 145 F.3d 420, 424 (1st Cir. 1998).  Where, however, a contract's terms are

ambiguous, interpretation of the term is an issue for the factfinder and summary judgment is only

appropriate if "the extrinsic evidence presented about the parties' intended meaning is so one-

sided that no reasonable person could decide to the contrary."  Id.  "The difference in these

standards is a result of the parol evidence rule, which Massachusetts follows."  Id.  The parol

evidence rule precludes "evidence of earlier or contemporaneous discussions that would modify

the provisions of a later integrated agreement which the proponent of the agreement seeks to

enforce" when interpreting an unambiguous term of an integrated contract.  New England Fin.

Res., Inc. v. Coulouras, 566 N.E.2d 1136, 1139 (Mass. App. Ct. 1991); see Fairfield 274–278

Clarendon Tr. v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992) ("Evidence of prior or

contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract.").

Section 9 of the Lease Agreement provides: "If tenant [Ms. Blenman] is planning any Sales Promotions, this must be authorized by Kryolan.  Tenant's promotions may reach out to the neighboring states of MA, as well as local theaters/opera/ballets, modelling schools, beauty schools, dermatologist, plastic surgeons, beauty stores/spas etc."  [ECF No. 51-12].  Kryolan contends that this term did not obligate it to provide marketing and advertising support to Zotbelle.  See [ECF No. 52 at 13–14].  Zotbelle does not directly dispute Kryolan's interpretation of § 9 and instead relies on its argument that the Lease Agreement was not integrated.  See [ECF No. 63 at 11].  Contract language is "considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken."  Rey v. Lafferty, 990 F.2d 1379, 1384 (1st Cir. 1993) (quoting Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)).  Here, § 9 contains no internal inconsistencies nor is it inconsistent with the rest of the Lease Agreement.  In addition, the language used in § 9 does not support a reasonable difference of opinion.  Section 9 clearly imposes an obligation on Ms. Blenman to ensure that any sales promotions are authorized by Kryolan Corporation.  It does not impose any obligations on Kryolan Corporation, including a duty to provide marketing or advertising assistance to Ms. Blenman.

Finally, applying the Court's interpretation of the plain meaning of § 9, the Court finds that Kryolan Corporation has not breached the Lease Agreement.  In Massachusetts, "[t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready,

willing, and able to perform his or her part of the contract; the defendant committed a breach of

the contract; and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 46

N.E.3d 24, 39 (Mass. 2016) (citing Singarella v. Boston, 173 N.E.2d 290, 291 (Mass. 1961)).

The parties dispute both whether Ms. Blenman was "ready, willing, and able" to perform her

obligations under the contract because of her immigration status and whether Kryolan

Corporation breached the contract. See [ECF No. 52 at 17–18; ECF No. 63 at 8–9, 11]. For the

purposes of its analysis, the Court assumes that Ms. Blenman's immigration status did not

disqualify her as "ready, willing, and able to perform [her] . . . part of the contract." See Bulwer,

46 N.E.3d at 39; [ECF No. 52 at 17–18]. Zotbelle contends that Kryolan breached the Lease

Agreement "by failing to provide the assistance it agreed to provide to Zotbelle," specifically the

marketing and advertising assistance that Kryolan allegedly orally agreed to provide to Zotbelle.

[ECF No. 63 at 11]. On the undisputed factual record, this claim fails as a matter of law because

the oral contract term on which it relies does not modify the Lease Agreement and because the

terms of the Lease Agreement do not require Kryolan Corporation to provide marketing and

advertising assistance to Ms. Blenman or to Zotbelle.[3]

       2.    Count VI: Breach of the Implied Covenant of Good Faith and Fair Dealing

Zotbelle also asserts a claim for breach of the implied covenant of good faith and fair

dealing against Kryolan. It bases this claim on five actions by Kryolan: (i) failing to provide the

"technical assistance, training and marketing support" requested by Zotbelle; (ii) terminating the

Lease Agreement without providing the requested support; (iii) demanding payment of the

---

[3] The Court does not interpret the pleadings or Zotbelle's briefing to assert a claim for breach of
an oral contract, therefore it does not address Kryolan's arguments to that effect. See [ECF No.
52 at 19–21 (arguing that any oral agreement to provide marketing and advertising services to
Zotbelle was not an enforceable contract and, even if it was, enforcement of the oral contract
would violate the Statute of Frauds); ECF No. 67 at 4 (similar)].

balance due by Zotbelle under the Lease Agreement; (iv) stopping orders to Kryolan City Boston; and, (v) placing Zotbelle's Barbados location on a "cash-only" purchase agreement and demanding that Zotbelle "pay an additional 25% . . . on top of each of Zotbelle's orders."  [Am. Compl. ¶¶ 90–93]; see [ECF No. 63 at 22–24].  For the same reason that the Court finds that Zotbelle lacks standing to bring a breach of contract claim, the Court also concludes that Zotbelle lacks standing to bring a claim for a breach of the implied covenant of good faith and fair dealing premised on the Lease Agreement to which it was not a party.  See Pollak v. Fed. Ins. Co., No. 13-cv-12114-FDS, 2013 WL 6152335, at *4 (D. Mass. Nov. 21, 2013).  Similarly, the Court concludes that this claim fails against Kryolan GmbH which was also not a party to the Lease Agreement.  See id.

Even if Zotbelle had standing to bring a claim for breach of the implied covenant of good faith and fair dealing against Kryolan Corporation, the claim is untenable because Kryolan's actions are either consistent with the terms of the parties' contract or fall outside the scope of the contractual relationship.  See [ECF No. 52 at 21–22; ECF No. 67 at 7–8].  In Massachusetts, "[e]very contract implies good faith and fair dealing between the parties to it."  Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991) (quoting Warner Ins. Co. v. Comm'r of Ins., 548 N.E.2d 188, 193 n.9 (Mass. 1990)).  "The covenant of good faith and fair dealing provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'"  T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010) (quoting Anthony's Pier Four, Inc., 583 N.E.2d at 806).  The "scope of the covenant is only as broad as the contract that governs the particular relationship."  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005).  "As a consequence, the implied covenant cannot 'create rights and duties not otherwise provided for in

the existing contractual relationship.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238

(1st Cir. 2013) (quoting Ayash, 822 N.E.2d at 684); see Mass. Eye & Ear Infirmary, 412 F.3d at

230 (1st Cir. 2005) ("[T]he implied covenant of good faith and fair dealing governs conduct of

parties after they have entered into a contract; without a contract, there is no covenant to be

breached.").  "The essential inquiry is whether the challenged conduct conformed to the parties'

reasonable understanding of the performance obligations, as reflected in the overall spirit of the

bargain . . . ." Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 55 (D. Mass. 2015) (quoting

Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005)).

As Kryolan argues, none of the actions cited by Zotbelle can be regarded as destroying or

injuring Zotbelle's right to the benefit of its bargain with Kryolan. See T.W. Nickerson, 924

N.E.2d at 704.  As previously addressed, and as Zotbelle appears to concede, Kryolan was not

obligated under the plain terms of the Lease Agreement to provide Zotbelle with "technical

assistance, training and marketing support" and, by extension, was not prohibited from

terminating the contract without providing this support.  See [ECF No. 51-12; ECF No. 63 at 11].

The Court has already found that oral promises made by the parties could not modify the Lease

Agreement.  See supra § III.A.1.  Kryolan was similarly acting within the terms of the Lease

Agreement when it demanded payment from Zotbelle for the unpaid debt.  Actions permitted by

a contract that are consistent with the parties' reasonable understanding of performance

obligations based on the plain terms of the contract cannot form the basis of a claim for breach of

the implied covenant of good faith and fair dealing.  Cf. Coriatt-Gaubil v. Roche Bobois Int'l,

S.A., 717 F. Supp. 2d 132, 141 (D. Mass. 2010) (applying New York law and rejecting

proposition that "a party can breach a contract's implied covenant of good faith and fair dealing

by seeking to enforce the plain terms of that contract").

The remaining actions are not covered by the contracting relationship, and thus fall

outside the scope of a claim based on the implied covenant.  See Ayash, 822 N.E.2d at 684.  For

example, neither the Lease Agreement nor the Loan Agreement covered terms relating to

Zotbelle's Barbados location.  Similarly, Kryolan stopped orders to Kryolan City Boston after it

terminated the Lease Agreement and its obligations under the agreement ceased.  Accordingly,

the Court grants summary judgment in favor of Kryolan on Zotbelle's claim for breach of the

implied covenant of good faith and fair dealing.

### 3.   Count II: Promissory Estoppel

In the alternative to relief pursuant to the terms of the parties' contracts, Zotbelle also

asserts a claim for promissory estoppel and argues that it reasonably relied to its detriment on

Kryolan's promises that "[Kryolan City Boston] would be a franchise of Kryolan" and that

Kryolan "would provide training, technical support, licenses, advertising assistance, marketing

assistance, oversight, guidance, and confidential business information necessary for [Kryolan

City Boston]'s success."  [Am. Compl. ¶¶ 63–67; ECF No. 63 at 11–12].  Kryolan argues that

this claim fails as a matter of law because Zotbelle has no evidence of the representations it

relied on and because any reliance on these supposed representations was unreasonable in light

of the execution of the Lease Agreement.  [ECF No. 52 at 22–23].

Regarding the alleged promise that Zotbelle would be a franchisee, Zotbelle

acknowledges that Ms. Blenman does not recall who at Kryolan represented to her that she

would be a franchisee but relies on Ms. Blenman's testimony concerning various conversations

with both Mr. Langer and Ms. Longo.  See [ECF No. 63 at 12].  Zotbelle also points to

documents dating from after the date of the Lease Agreement in which the word franchise is

used.  See [id. at 12–13].  Concerning representations about assistance, Zotbelle directs the Court

to the May 14, 2013 email that stated that "additional assistance from Kryolan is available upon request, within reason and under agreement." [Id. at 13].  Zotbelle further asserts that the parties orally agreed that Kryolan would provide marketing and advertising assistance to Zotbelle.  [Id.].

To succeed on a claim of promissory estoppel under Massachusetts law, a plaintiff must demonstrate that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.'"  Rogatkin ex rel. Rogatkin v. Raleigh Am., Inc., 69 F. Supp. 3d 294, 301 (D. Mass. 2014) (quoting Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004)).  "Whether reliance is reasonable is ordinarily a question of fact for a jury. However, if, on the facts alleged . . . no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law."  Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 370 (D. Mass. 2002) (quoting Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 242 (D. Mass. 1999)).

Applying these principles, the Court finds that any reliance on the part of Zotbelle on the asserted statements or its expectation that Kryolan would provide marketing and advertising support for Zotbelle was unreasonable.[4]  Zotbelle argues that it was promised support from Kryolan in the form of "training, technical support, licenses, advertising assistance, marketing

---

[4] Kryolan argues that Zotbelle seeks to extend the doctrine of promissory estoppel beyond its boundaries by applying the doctrine to a situation in which the parties had an enforceable contract.  See [ECF No. 52 at 22–23].  Although it is well-established that "[t]he doctrine of promissory estoppel is designed to create an enforceable promise in the absence of consideration or an otherwise valid contract," Consolo v. Bank of Am., No. 15-cv-11840, 2017 WL 1739171, at *5 (D. Mass. May 2, 2017), and that parties to an enforceable contract who dispute the contract's terms or scope cannot recover under a theory of promissory estoppel, see Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996), these principles are not applicable here because the Court has found that Zotbelle was not a party to the Lease Agreement, see supra § III.A.1.

assistance, oversight, guidance, and confidential business information," yet there is no evidence that when the Kryolan City Boston store opened in December 2013 any of this support was provided.  Ms. Blenman later entered into an agreement for running the Kryolan City Boston store in February 2014, which also did not provide for this support.  See [ECF No. 51-12].  Any reliance on a statement made once during initial negotiations in May 2013 that "additional assistance" would be provided is not reasonable in light of the course of Zotbelle's ongoing business relationship with Kryolan, which did not included the promised support, and taking into account the agreement entered into by Zotbelle's President that also did not provide for the promised support.

Although Zotbelle's reliance on statements concerning a franchise relationship with Kryolan may not have been unreasonable, the purported promise is not enforceable for vagueness.[5]  In Massachusetts, "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration."  R.I. Hosp. Tr. Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1179 (Mass. 1995).  "[I]n order to establish the existence of an enforceable promise under promissory estoppel, the plaintiff must show that the defendants' promise included enough essential terms so that a contract including them would be capable of being enforced."  Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 82 (D. Mass. 2004).  Here, the alleged promise that Kryolan City Boston would be a franchise of Kryolan lacked the essential terms of a franchise agreement, including the length of the franchise, the franchise fee, and the extent of authority Kryolan would

---

[5] In addition, to the extent the alleged promise regarding a franchise relationship sought to create a five-year franchise term consistent with the Lease Agreement, enforcement of that oral agreement would violate the Statute of Frauds.  See Mass. Gen. Laws ch. 259, § 1 ("No action shall be brought . . . [u]pon an agreement that is not to be performed within one year from the making thereof."); [ECF No. 52 at 19–21].

have over Kryolan City Boston.  See, e.g., 16 C.F.R. § 436.1 (2019) (defining "franchise").

Therefore, any promise made by Kryolan that Kryolan City Boston "would be a franchise of

Kryolan" is too vague and indefinite to be enforced under the doctrine of promissory estoppel.

See Armstrong, 349 F. Supp. 2d at 82.  Accordingly, the Court grants summary judgment for

Kryolan on Zotbelle's promissory estoppel claim.

 **B.      Fraud Claims**

Zotbelle alleges that Kryolan intentionally and negligently misrepresented to her that

Kryolan City Boston would be a franchise of Kryolan and that Kryolan would provide Zotbelle

with the support needed for Kryolan City Boston to succeed.  [Am. Compl. ¶¶ 69–71, 73–75];

[ECF No. 63 at 15–16, 18].  Zotbelle further claims that Kryolan induced Zotbelle to enter into

the Lease Agreement based on its knowing misrepresentations.  [Am. Compl. ¶ 69].  Kryolan

asserts that Zotbelle's claims for misrepresentation cannot survive summary judgment because

Zotbelle cannot prove that its reliance on Kryolan's representations was reasonable and further

contends that Zotbelle's reliance was unreasonable as a matter of law because the promises were

not reflected in the Lease Agreement.  See [ECF No. 52 at 23–24; ECF No. 67 at 6].

To succeed on a claim of intentional misrepresentation under Massachusetts law, a

plaintiff must show "a false statement of material fact made to induce the plaintiff to act and

reliance on the false statement by the plaintiff to his detriment."  Edlow v. RBW, LLC, 688 F.3d

26, 36 (1st Cir. 2012); see Cummings v. HPG Int'l, Inc., 244 F.3d 16, 22 (1st Cir. 2001);

Zimmerman v. Kent, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991).  A claim for negligent

misrepresentation requires a plaintiff to show that defendant "provided it with false information"

and "fail[ed] to exercise reasonable care or competence in obtaining or communicating the

information."  Cummings, 244 F.3d at 23 (quoting Nota Constr. Corp. v. Keyes Assoc., 694

N.E.2d 401, 405 (Mass. App. Ct. 1998)).  Under either theory, "a plaintiff must show reasonable

or justifiable reliance on the allegedly injurious representation."  Edlow, 688 F.3d at 36.

As above, because Zotbelle was not a party to the Lease Agreement, its claim for

intentional misrepresentation cannot rest on a theory that it was induced by the alleged

misrepresentations to enter into the Lease Agreement.  See supra §§ III.A.1–2.  Assuming that

Zotbelle could set out a claim that it was induced to act by the alleged misrepresentations, its

claim for misrepresentation still fails under either a theory of intentional or negligent

misrepresentation because its reliance on the statements was unreasonable.

Here, Zotbelle identifies the following two alleged misrepresentations: "that Kryolan

would provide [Zotbelle] with training, technical support, licenses, advertising assistance,

marketing assistance, oversight, guidance, and confidential business information necessary for

[Kryolan City Boston's] success" and "that [Kryolan City Boston] would be a franchise of

Kryolan." [Am. Compl. ¶ 69].  Zotbelle does not identify who made these representations to it or

when those representations occurred, although the Court implies from the context of the

Amended Complaint that they occurred prior to February 4, 2014, when the Lease Agreement

was signed.

The alleged misrepresentations are "statements and promises allegedly made in the

context of negotiating [an] . . . agreement" but that were not included in the executed agreement.

See Edlow, 688 F.3d at 36–37.  As discussed, the Lease Agreement did not incorporate any

actionable promises from Kryolan regarding the assistance Zotbelle claims it was promised and

neither did the proposal that Ms. Blenman received on July 12, 2013.  See [KSOF ¶ 20; ECF No.

51-10; ECF No. 51-11].  Nor does the Lease Agreement reference a franchise relationship.

Apart from a May 2013 email regarding support, all of the documentary evidence Zotbelle

produces in support of this claim is from after February 4, 2014 and has no bearing on the

Court's analysis because it cannot have induced any actions on or before February 4.  Even

assuming that Kryolan made a factual misrepresentation concerning its intended relationship

with Zotbelle or concerning assistance it would provide to Zotbelle, the Court cannot conclude

that Zotbelle's reliance on these alleged misrepresentations was reasonable when its President

entered into the Lease Agreement, which contradicted these same promises and omitted any

reference to these promises.  See id.

### C.      Chapter 93A Claim

Zotbelle alleges that Kryolan violated Chapter 93A by failing to provide Zotbelle with

disclosures provided by Federal Trade Commission ("FTC") Act rules, terminating the Lease

Agreement and stopping orders to Kryolan City Boston, and changing the terms under which

Zotbelle Barbados could purchase Kryolan products.  [Am. Compl. ¶¶ 77–88].  Zotbelle argues

that it was a franchisee and that a violation of the FTC Act is a per se violation of Chapter 93A.

See [ECF No. 63 at 18–22].  Kryolan contends that Zotbelle was not a franchisee but argues that,

even assuming Zotbelle was Kryolan's only franchisee, the Chapter 93A claim must fail as a

matter of law because Zotbelle cannot show causation or damages, which are elements required

to state a viable claim under Chapter 93A.  [ECF No. 52 at 25].

### 1.      Disclosures Required by 16 C.F.R. §§ 436.2, 436.5(k), (q)

Zotbelle argues that Kryolan's failure to provide the disclosures specified in 16 C.F.R.

§ 436.2 and § 436.5(k), (q) is a per se violation of Chapter 93A.  See [ECF No. 49-1 at 11–12,

14–16].  Section 436.2 requires a franchisor to provide disclosures to a prospective franchisee "at

least 14 calendar-days before the prospective franchisee signs a binding agreement with, or

makes any payment to, the franchisor or an affiliate in connection with the proposed franchise

sale."  16 C.F.R. § 436.2.  Section 436.5 identifies the contents of that required disclosure and

requires *inter alia* disclosures concerning "the franchisor's principal assistance and related obligations" and terms for "Renewal, Termination, Transfer, and Dispute Resolution."  Id. § 436.5(k), (q).  Kryolan does not dispute that it did not provide these disclosures, but asserts that even assuming the existence of a franchise relationship, any failure to provide required disclosures cannot constitute a violation of Chapter 93A because Zotbelle has not met the required elements of causation and damages.  See [ECF No. 59 at 5–6, 11–12]; see also [ECF No. 52 at 24–25].

> FTC regulations define a "franchise" as
>
> [A]ny continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:
>
> (1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;
>
> (2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and
>
> (3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h)(1)–(3).  There is a disputed question of fact as to whether a franchise relationship existed and whether the $17,000 Ms. Blenman contracted to pay to Kryolan constituted a franchise fee.  See [ECF No. 49-1 at 8–11; ECF No. 52 at 24–25]; see also First Mut., Inc. v. Rive Gauche Apparel Distribution, Ltd., No. 90-cv-10899-Z, 1990 WL 235422, at *4 (D. Mass. Dec. 21, 1990) (stating that dispute over whether a payment constituted a franchise fee "is factual and therefore not susceptible to dismissal").  This factual dispute does not preclude summary judgment on this claim, however, because the Court concludes that Zotbelle

has failed to make out the required elements of its claim.  The Court first proceeds to address

whether there is per se liability under Chapter 93A and then turns to whether Zotbelle has stated

a Chapter 93A claim that may go to a jury.

> To prevail on a claim under section 11 of Chapter 93A, a commercial plaintiff must prove 1) that defendants engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by M.G.L. c. 93A, § 2, or the regulations promulgated thereunder; 2) a loss of money or property suffered as a result and 3) a causal connection between the loss suffered and the defendants' unfair or deceptive method, act or practice.

Malden Transp., Inc. v. Uber Techs., Inc., No. 16-cv-12538-NMG, 2019 WL 4247988, at *9 (D.

Mass. Sept. 6, 2019) (citing Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066,

1074–75 (Mass. 2014)).  Section 2 of Chapter 93A declares unlawful "unfair or deceptive acts or

practices in the conduct of any trade or commerce" and instructs courts to be "guided by the

interpretations given by the [FTC] and the Federal Courts to section 5(a)(1) of the [FTC] Act."

Mass. Gen. Laws. ch. 93A, § 2.  "The Massachusetts Supreme Judicial Court has held that a

practice is unfair if it is within 'the penumbra of some common-law, statutory, or other

established concept of unfairness . . . is immoral, unethical, oppressive, or unscrupulous; [and]

. . . causes substantial injury.'"  Lannan v. Levy & White, 186 F. Supp. 3d 77, 97 (D. Mass.

2016) (quoting Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997)).

Based on Massachusetts case law describing the relationship between Chapter 93A and

the FTC Act, the First Circuit in McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d

109 (1st Cir. 2014), recently confirmed that, "because Massachusetts has folded the FTC Act

into Chapter 93A, unfair or deceptive conduct that violates the FTC Act also violates Chapter

93A."  McDermott, 775 F.3d at 122.  In McDermott, the First Circuit then went on to hold that a

violation of the Federal Debt Collection Practices Act ("FDCPA") is a per se violation of the

FTC Act and therefore also a per se violation of Chapter 93A.  Id. at 122–23.  It began with the

observation that the "FDCPA explicitly provides that a violations of its provisions 'shall be deemed an unfair or deceptive act or practice in violation of' the FTC Act." Id. at 122 (quoting 15 U.S.C. § 1692*l*(a)).  In other words, "an unfair debt collection act in violation of the FDCPA is a per se violation of the FTC Act." Id. at 123.  Therefore, the First Circuit reasoned, "because Massachusetts has 'wholly incorporated' the FTC Act and its interpretation into state consumer protection law, a violation of the FDCPA not only per se violates the FTC Act, it also constitutes a per se Chapter 93A violation." Id.[6]

Although McDermott establishes that there can be per se violations of Chapter 93A, it does not dispose of the question of whether a violation of an FTC regulation is a per se violation of Chapter 93A.  Zotbelle asks this Court to extend McDermott's reasoning to this case, while Kryolan cautions that this extension would create a cause of action in which the traditional elements required to bring a Chapter 93A claim, such as causation and damages, are ignored. See [ECF No. 49-1 at 12–13; ECF No. 59 at 11–12].  To be sure, there are similarities between the language in the FDCPA that the First Circuit relied on in McDermott and the FTC regulations.  For example, 16 C.F.R. § 436.2 provides that

> [I]t is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act: (a) For any franchisor to fail to furnish a prospective franchisee with a copy of the franchisor's current disclosure document . . . at least 14 calendar-days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

---

[6] The First Circuit's decision in McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109 (1st Cir. 2014) engaged with the Massachusetts Supreme Judicial Court's decision in Klairmont v. Gainsboro Rest., Inc., 987 N.E.2d 1247 (Mass. 2013).  McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 118–22 (1st Cir. 2014).  Because the Court follows McDermott, which accounts for Klairmont's holding, the Court omits any discussion of Klairmont and 940 C.M.R. § 3.16(4) that would be repetitive of the discussion in McDermott. See id. at 122 (rejecting path to per se liability through Massachusetts Attorney General's regulation at 940 C.M.R. § 3.16(4)).

16 C.F.R. § 436.2.  In its ruling in <u>McDermott</u>, however, the First Circuit has, in effect, ruled that "[t]he FDCPA is within [the] penumbra of statutory concepts of unfairness."  <u>Lannan</u>, 186 F. Supp. 3d at 97.  It has long been recognized in this district that no similar blanket rule applies to FTC regulations; rather, to state a claim under Chapter 93A based on a violation of an FTC regulation, a plaintiff must also demonstrate that the conduct is within the meaning of "unfair" conduct covered by Chapter 93A and must establish both causation and damages.  <u>See</u> <u>Ferreira v. Sterling Jewelers, Inc.</u>, 130 F. Supp. 3d 471, 478 (D. Mass. 2015) (ruling on claim under section 9 of Chapter 93A that "[a] per se violation alone—simply proving that [defendant] violated the FTC regulations—is not enough to prevail"); <u>Symes v. Bahama Joe's, Inc.</u>, No. 87-cv-00963-Z, 1988 WL 92462, at *5 (D. Mass. Aug. 12, 1988) (noting that "[a]lthough chapter 93A, § 2(b) allows courts . . . to be guided by Federal Trade Commission's and Federal Courts' interpretations of § 5(a)(1) of the FTC Act, this does not mean that a violation of the Franchising Rules, *ipso facto,* leads to a violation of chapter 93A" because the alleged unfair or deceptive practice must also fall within "the penumbra of some common-law, statutory, or other established concept of unfairness"); <u>see also</u> <u>Honey Dew Assocs., Inc. v. Creighton Muscato Enters., Inc.</u>, 903 N.E.2d 239, 244 n.13 (Mass. App. Ct. 2009) (recognizing that "[a]n allegation of noncompliance with Federal Trade Commission regulations, including 16 C.F.R. § 436, can state a claim under G.L. c. 93A").  Furthermore, Zotbelle has not provided, and the Court has not identified, any case law suggesting that the First Circuit intended its holding in <u>McDermott</u> to alter the landscape of Chapter 93A case law or to create causes of action based on violations of FTC regulations where they may not have existed before.  Accordingly, although the Court recognizes that a violation of an FTC regulation can state a claim under Chapter 93A, it must go onto consider whether Zotbelle has a valid claim.

Zotbelle's Chapter 93A claim based on lack of appropriate disclosures is based on its contention that had it received the appropriate disclosures, it may have not entered into the Lease Agreement. See [Am. Compl. ¶¶ 34, 85]. Kryolan argues that Zotbelle cannot establish a causal link between Kryolan's failure to provide a disclosure document and any monetary or property loss and therefore should not be allowed to bring its claim before a jury. See [ECF No. 59 at 11–12]. As the Court has found, Zotbelle never entered into the Lease Agreement. See § III.A.1. While Zotbelle did suffer economic losses pursuant to the Loan Agreement and its debt to Kryolan GmbH, there is no connection between Kryolan's failure to provide the required disclosures prior to December 2013 and Zotbelle's choice to enter into a Loan Agreement a year later. Without a nexus between the allegedly unfair or deceptive action and a plaintiff's loss, Zotbelle's claim under Chapter 93A based on lack of disclosures fails. See Ferreira, 130 F. Supp. 3d at 478, 484–85 (stating that a chapter 93A claim requires a plaintiff to demonstrate a harm arising from the violation "that bears a causal connection to the unfair or deceptive act," that such proof includes both "but for" and proximate causation, and dismissing chapter 93A claim for failure to prove causation).

Accordingly, the Court denies Zotbelle's motion for summary judgment on its Chapter 93A claim based on lack of disclosures because a violation of an FTC regulation is not a per se violation of Chapter 93A absent a showing of causation. The Court grants Kryolan's motion for summary judgment on the Chapter 93A claim based on lack of disclosures because Zotbelle has failed to establish the requisite element of causation, which is necessary to sustain its claim.

2.     Failure to Provide Marketing and Advertising Support

Zotbelle reprises its argument concerning marketing and advertising support and claims that Kryolan's failure to provide marketing and advertising support was an unfair or deceptive business practice. This claim fails for the reasons described above. See [ECF No. 59 at 13–14];

supra §§ III.A.1–2 (explaining that, even assuming Zotbelle was a party to the Lease Agreement,

Kryolan had no contractual obligation to provide marketing and advertising support to Zotbelle),

III.B. (finding no viable misrepresentation claim based on Kryolan's failure to provide marketing

and advertising support to Zotbelle).  Kryolan's actions were consistent with the bargained-for

terms of its contract with Ms. Blenman concerning management of the Kryolan City Boston

store and thus cannot be reasonably interpreted as being either unfair or deceptive.  See Davidson

v. Gen. Motors Corp., 786 N.E.2d 845, 850–51 (Mass. App. Ct. 2003) (concluding that

defendant's conduct could not be interpreted as unfair or deceptive based on parties' express

agreement).  In addition, even if the failure to provide this support was a breach of the Lease

Agreement, a breach by itself is not sufficient to sustain a Chapter 93A claim.  See Ahern v.

Scholz, 85 F.3d 774, 798 (1st Cir. 1996) ("The simple fact that a party knowingly breached a

contract does not raise the breach to the level of a Chapter 93A violation . . . ."); Brennan v.

Carvel Corp., 929 F.2d 801, 813–14 (1st Cir. 1991) (concluding that franchisor did not violate

Chapter 93A when it breached its agreement to select and approve franchisee site because a

breach of contract without more is not sufficient to state a claim for Chapter 93A).  Accordingly,

the Court grants summary judgment to Kryolan on Zotbelle's Chapter 93A claim to the extent

that it is based on Kryolan's failure to provide advertising or marketing support services to

Zotbelle.

### 3.    Termination of Lease Agreement and Related Actions

Finally, Zotbelle asserts that the following actions by Kryolan constitute unfair and

deceptive business practices: terminating the Lease Agreement and demanding return of the

retail space and payment of balance due, terminating the Lease Agreement without providing

business assistance, stopping orders to Kryolan City Boston, and changing terms under which

Zotbelle Barbados could purchase Kryolan products.  See [ECF No. 49-1 at 15–16].  The Court

views this as an attempt by Zotbelle to reframe its breach of contract and breach of the implied covenant of good faith and fair dealing claims as a Chapter 93A claim.  For the reasons described above, a breach of contract without more is not ground for a Chapter 93A claim.  See Ahern, 85 F.3d at 798; Brennan, 929 F.2d at 813–14.

In addition, the actions Zotbelle identifies do not rise to the level of unfair or deceptive conduct that would be actionable under Chapter 93A.  As Massachusetts courts have often recognized, the standard of unfairness applied to claims brought by businesses under section 11 of Chapter 93A is higher than the standard applied to claims brought by consumers under section 9.  See Lily Transp. Corp. v. Royal Institutional Servs., Inc., 832 N.E.2d 666, 686 n.14 (Mass. App. Ct. 2005) (collecting cases); Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1217 n.7 (Mass. App. Ct. 1989).  Here, the Court has no basis on which to conclude, based on the undisputed evidence, that Kryolan's aforementioned conduct was either unfair or deceptive within the meaning of Chapter 93A.  Kryolan terminated the Lease Agreement for causes that Zotbelle does not dispute.  Consistent with the terms of the contracts, Kryolan demanded repayment of the balance due under the Lease Agreement, and by extension the Loan Agreement, which Zotbelle concedes was overdue.  Kryolan was under no obligation to provide marketing assistance to Zotbelle under the terms of the Lease Agreement.  Kryolan also had no obligation to allow orders to Kryolan City Boston after terminating the Lease Agreement. Finally, it was not unfair or deceptive for Kryolan to alter the terms under which Zotbelle Barbados could purchase Kryolan products.  Accordingly, the Court grants summary judgment to Kryolan on Zotbelle's Chapter 93A claim to the extent that it is based on Kryolan's termination of the Lease Agreement, stopping orders to Kryolan City Boston, or changing terms for purchases by Zotbelle Barbados.

**D.     Kryolan GmbH's Counterclaim**

Kryolan moves for summary judgment on Kryolan GmbH's breach of contract counterclaim, which alleges that Zotbelle failed to comply with the repayment terms of the Loan Agreement. [ECF No. 36 at 11–13].  On December 18, 2014, Kryolan GmbH entered into the Loan Agreement with Zotbelle, pursuant to which Kryolan GmbH loaned Zotbelle $63,010.37 and Zotbelle agreed to repay the loan in monthly installments." [ECF No. 51-21].  Section 7 of the Loan Agreement provides that the Loan Agreement would not be valid past December 31, 2017 and that, at that time, the remaining loan and interest had to be paid in full. [Id.].  Section 8 of the Loan Agreement allowed Kryolan GmbH to terminate the Loan Agreement and demand immediate repayment "[i]f debtor has failed to pay the monthly minimum installment . . . for 3 consecutive months . . . ." [Id.].  Section 9 states that Zotbelle "agrees and accepts that under such circumstances as outlined in § 7 the Kryolan Corporation has the right to terminate the [Lease Agreement] with immediate effect."[7] [Id.].

Kryolan argues that summary judgment on Kryolan GmbH's counterclaim is proper because the record demonstrates that Zotbelle failed to make payments due under the Loan Agreement.  See [ECF No. 52 at 25–26].  Kryolan supports its motion with Zotbelle's interrogatory response stating that it owed "$56,781 plus interest" to Kryolan[8] and with a document Zotbelle produced that lists "Payments Made to Loan from Kryolan Germany," which shows only eight payments between October 2014 and September 2015  See [KSOF ¶ 53; ECF

---

[7] It is unclear whether the reference to "§ 7" is to § 7 of the Loan Agreement, which states that the agreement will remain valid until December 31, 2017, or to § 7 of the Lease Agreement, which describes terms for the payment of product orders.  See [ECF Nos. 51-12, 51-21].

[8] The relevant interrogatory requested Zotbelle to "[i]dentify the total sums currently owed, or claimed owed by You in connection with the Zotbelle business in Boston, Massachusetts." [ECF No. 51-25 at 4].  Zotbelle responded that "it believes that the total amount owed to the Defendant is approximately $56,781.00 plus interest." [Id. at 4].

No. 51-22; ECF No. 52 at 25–26]; see also [ECF No. 51-24 (describing Zotbelle's failure to comply with repayment terms of Loan Agreement)]. Zotbelle purports to dispute the assertion that it failed to make the payments required by the Loan Agreement, but the evidence it presents only provides an explanation for why it struggled with the repayment schedule. See [ECF No. 64 at 20–21]. Similarly, Zotbelle's brief contends that Zotbelle was "relieve[d]" of its duty to perform under the Loan Agreement by "Kryolan's failure to provide the necessary support to Zotbelle," but this interpretation is also not supported by the terms of the Loan Agreement or any other evidence in the summary judgment record. See [ECF No. 63 at 26]; see also [ECF No. 63 at 25–26 (stating that "[t]he Loan Agreement was conditioned upon Zotbelle's performance under the [Lease] Agreement," which was not satisfactory "[d]ue to Kryolan's failure to provide the requested assistance")].

As previously indicated, "[t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result."[9] Bulwer, 46 N.E.3d at 39. Here, the evidence in the summary judgment record shows that Kryolan GmbH and Zotbelle entered into a valid contract that required Zotbelle to repay the loan in monthly installments of $1,000, that Kryolan GmbH was ready, willing, and able to perform its part of the Loan Agreement, that Zotbelle failed to adhere to the agreed-upon repayment schedule, and that Kryolan GmbH was damaged as a result of this breach. See [ECF Nos. 51-21, 51-22, 51-24]. Therefore, the Court grants summary judgment for Kryolan GmbH on its breach of contract counterclaim.

---

[9] The parties have not briefed what law controls the interpretation of the Loan Agreement. The Court assumes that Massachusetts law applies.

IV.     **CONCLUSION**

Accordingly, Kryolan's motion for summary judgment on all counts of the Amended Complaint and on its cross-claim [ECF No. 50] is <u>GRANTED</u>, and Zotbelle's motion for partial summary judgment on Count V [ECF No. 49] is <u>DENIED</u>.

**SO ORDERED.**

September 23, 2019                                              <u>/s/ Allison D. Burroughs</u>
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE